## University Park Cinemas, Inc. v.
## Borough of Windber

*Myron I. Markovitz,* of *Gleason, DiFrancesco, Shahade & Markovitz,* for plaintiffs.

*Eugene E. Fike, 2d,* of *Fike, Cascio & Boose,* for defendants.

COFFROTH, P. J., December 8, 1972.—This case is before the court en banc on plaintiffs' exceptions to the adjudication and decree nisi. Plaintiffs have excepted to the third, fourth, seventh, eighth and ninth findings of fact as being contrary to, or unsupported by, the evidence, to all five conclusions of law and to the decree nisi.

### FACTS

Since 1926, Windber Borough has imposed by ordinance a license fee on certain amusements in-

cluding one on motion pictures of $50 per year, or $5 per month. In March 1972, that ordinance was amended imposing an additional license fee on showing X-rated movies at the rate of $25 for each day such a movie is shown. An X-rated movie is one "to which children under the age of 18 are not to be admitted," according to the motion picture industry, but the ordinance does not in any way restrict attendance at, or otherwise regulate the showing of, such movies. The ordinance requires that a license to show X-rated movies be obtained, and makes each day's failure to pay the fee a separate summary offense, conviction of which is subject to a fine and imprisonment. Plaintiffs operate the only theater in Windber Borough; its chief business is showing X-rated movies each night of the week. The business has been so successful that the borough has been required to add to the police force an additional full-time policeman for general duty because of the influx of people and vehicles to the borough patronizing the X-rated movies. The theater seats 600 persons; Windber's population is 6,300 and has limited public parking facilities at parking meters on the streets and no off-street public parking lots. The additional license fee of $25 per day approximately covers the cost of the additional police officer. The record shows that the regular borough police force presently consists of six policemen. No other license fee or charge is imposed by the borough on any person, firm or corporation for police or traffic service except parking meter fees. The trial judge concluded that the ordinance imposed a valid and reasonable license fee for special municipal services rendered to plaintiffs, and made a decree nisi dissolving the preliminary injunction and dismissing the complaint.

## DISCUSSION

This theater license ordinance cannot stand because, even accepting the findings of fact and the specific conclusions of law for purposes of this opinion, the borough council had no authority under Pennsylvania law to enact the ordinance in its present form. The exceptions to the decree nisi must, therefore, be sustained and a decree made enjoining enforcement of the amendatory ordinance.

It should be observed at the outset that this ordinance imposes two license fees on theaters: 1. An annual fee of $50, or $5 per month, on all theatrical and moving picture exhibitions (section 101A, adopted in 1926); and 2. a daily fee of $25 for each day an X-rated movie is shown (section 101B, adopted in 1972). Only the daily fee is under challenge, so that we do not pass upon the validity of the annual fee.

In order to sustain this ordinance, the borough must point to a law authorizing its enactment, because in Pennsylvania every municipality is a creature of the State and is a government of limited authority, having only such powers as the State has by law delegated to it: 25 P. L. Encyc., Municipalities, §§1, 41, 42 and 43. See Pennsylvania Constitution, new Article IX. A Pennsylvania borough possesses five basic means by which it may legally raise revenue: they are: (1), taxes; (2) assessments; (3) sale of municipal service; (4) fines; and (5) license fees. The borough does not claim that its daily fee can be sustained as a tax, or assessment, or sale of a municipal service, or fine, but does contend that it is a valid license fee. Before considering license fees, however, we should first briefly comment on the other four types of revenue raising.

## Taxes

The taxing powers of a borough are found in Article XIII of The Borough Code of February 1, 1966, P. L. (1965) 1656, 53 PS §45101, et seq., and in the Local Tax Enabling Act of December 31, 1965, P. L. 1257, 53 PS §6901, et seq. Article XIII of the code authorizes only taxes on real estate and on occupations. The Local Tax Enabling Act permits the imposition of taxes on certain persons, transactions, occupations and privileges. But these statutes do not authorize the imposition, as taxes, of the fees contained in this ordinance. In fact, the latter act even prohibits boroughs and certain other municipalities from placing a tax on admissions to motion picture theaters: 53 PS §6902(10).

There is no provision of law today for the imposition by a borough of any tax for the special support of the police department (see Durach's Appeal, 62 Pa. 491), and this ordinance is not a valid exercise of the taxing power.

## Assessments

Assessments for certain municipal improvements in boroughs are authorized by law, for street improvement (53 PS §46761 and 46774); sidewalks (53 PS §46805); sewers (53 PS §47002 and 47003) and street light installation (53 PS §46202(50). Such assessments are a species of taxation and have their legal basis in the taxing power, but they are not strictly taxes because they are not levied for the benefit of the general public, but primarily for the local convenience and the additional benefit of owners of abutting private property: Southwest Delaware County Municipal Authority v. Aston Township, 413 Pa. 526,

530; Evans v. West Norriton Township Municipal Authority, 370 Pa. 150; Philadelphia v. United States Housing Corporation, 280 Pa. 417; Erie School Appeal, 155 Pa. Superior Ct. 564; 25 P. L. Encyc. Municipal Corporation 578 §361.

Sometimes a hybrid sort of assessment by a municipality for a recurring or continuing service, as distinguished from construction of an improvement, is authorized, not as an exercise of the taxing power as in the case of an improvement, but like a sale of a product to the consumer by the municipality in its proprietary capacity. See The Second Class Township Code of May 1, 1933, P. L. 103, as amended, 53 PS §65702, which under certain circumstances authorizes a municipal assessment for street lighting: Manheim Township Supervisors v. Workman, 350 Pa. 168.

All of these assessments are limited in amount by the cost of the improvement, or service rendered.

But there is no statutory authority for the assessment of the cost of the police force or portion thereof, and such cost cannot, therefore, be assessed even though general police service might be regarded as supervisors benefiting some business operation or property. In addition, any statute purporting to authorize assessment for a *governmental,* as distinguished from a *proprietary,* service is probably unconstitutional in Pennsylvania. See Manheim Township Supervisors v. Workman, 350 Pa. 168. Police service is a governmental, not a proprietary, function of government: Hartness v. Allegheny Co., 349 Pa. 248, 250; Devers v. Scranton, 308 Pa. 13; Iben v. Monaco Borough, 158 Pa. Superior Ct. 46, 50; Crostwaite, Borough Law (1929 Ed.) page 112.

## *Sale of Public Services*

Municipalities are authorized by law to sell certain public services of a proprietary character at reasonable rates, as any private corporation. Boroughs may furnish a public water supply, (53 PS §46202(30) and §47401); electricity (53 PS §47471); garbage and refuse removal (53 PS §46202(45); parking lots (53 PS §46202(46)), and make charges therefor (53 PS §46202(2)).

The charges made for these services are not based upon either the taxing power or the police power, but are contractual or quasi-contractual in character; the duty to pay arises from an agreement to pay, express or implied, for services received from which the recipient has derived special benefit not enjoyed by the nonuser.

In order for charges for services sold to be valid, the service rendered must meet three requirements: (1) The municipality must be authorized by law to render it and charge for it; (2) the service must be proprietary, not governmental, in nature; and (3) the service must be specially rendered to the user and not merely to the community as a whole.

The services rendered by a municipal police department in general law and traffic enforcement in streets and public places, do not meet any of these requirements, even though it is determinable that a certain portion of the cost of the police department is attributable to traffic in the municipality generated or attracted by a given business activity, because: (1) There is no law authorizing a charge or assessment for such service; (2) it is governmental, not proprietary in character; and (3) the benefit of the service accrues to the community as a whole and not

specially to any particular business or person. See Manheim v. Workman, supra; Hamilton's Appeal, 340 Pa. 17; Erie Appeal, supra.

## Fines

A fine or penalty is not a tax, or assessment or charge for services sold, and differs substantially from a license fee. The purpose of the fine is to punish violators and to deter future violations, and the amount thereof may be fixed at whatever sum will effectively accomplish those objects irrespective of the cost to the municipality of enforcement and collection: Mastrangelo v. Buckley, 433 Pa. 352. Compare Freeman v. Philadelphia, infra. The purpose of the license fee is not punitive.

## License Fees

A license fee is not a tax, nor an assessment, nor payment for a service voluntarily contracted, nor a fine. These five measures have one common characteristic: they augment the revenues of government. Payments for services voluntarily contracted for are readily distinguishable from taxes, assessments, fines and license fees in that the latter are noncontractual and are or may be imposed without the request or consent of the citizen. Taxes and assessments differ from fines and license fees in that the former are an exercise of the taxing power whose primary object is to raise revenue for general or special governmental purposes. The fine and license fee are incidents of an exercise of the police power whose revenue raising purpose is but secondary; the purpose of the fine is punitive whereas the purpose of the license is regulatory and its fee is but reimbursement for out-of-pocket expense of the municipality.

Being but an incidental feature of a regulatory enactment, a license fee is severely restricted in amount to that necessary to pay for *the actual or probable cost of the governmental regulation and supervision of the business or activity which the regulatory enactment lawfully requires.*

The term "license" comes from the fact that a means of regulation commonly employed in police power enactments is the requirement that the person carrying on the regulated activity acquire a license to do so in aid of the regulation, and the "fee" is the price of the license. Semantic confusion arises, however, from the fact that the licensing device is sometimes also used as an aid to lawful taxation giving rise to the term "license tax." See National Biscuit Co. v. Philadelphia, 374 Pa. 604, and Rice Drug Company v. Pittsburgh, 360 Pa. 240. Occasionally, the term "license fee" is used to describe a tax: Philadelphia Tax Review Board v. Smith, Kline and French Laboratories, 437 Pa. 197. And, occasionally, the term "license tax" will be used to mean a regulatory "license fee," and the terms are sometimes used interchangeably. See Kittanning Borough v. Consolidated Natural Gas Company, 219 Pa. 250, and Ridley Park Borough v. Citizen's Electric Light and Power Company, 9 Pa. Superior Ct. 615. "The basic difference between a tax and a license fee lies in the purposes of its exactions": 22 P. L. Encyc. Licenses, 309 §3.

The correct and strict meaning of the term "license fee" which we use here is a fee charged for a license required by a regulatory enactment made in the exercise of the police power. The ordinance under consideration here, imposing on movie theaters both an annual fee and a daily fee, applies the term "license fee" to both. But the name given to the fee in the

ordinance is not controlling; the court must pierce the veil of nomenclature to determine the true character of the charge: National Biscuit Co. v. Philadelphia, supra. Realities, not labels, control: Commonwealth v. Eastman Kodak Company, 385 Pa. 607. See also 53 C.J.S. Licenses, §3. Since a municipality is a government of limited and delegated powers, it is essential that we know the precise character of the fee imposed, whether a tax under the taxing power or a license fee under the police power, in order to determine whether the power exists to enact it. Since the borough seeks to validate the challenged fee as a regulatory license fee, the statement of the court in Kittanning Borough v. American Natural Gas Company, 239 Pa. 210, 211, is especially pertinent:

"If anything can be considered as settled under the decisions of our Pennsylvania Courts it is that municipalities under the guise of a police regulation cannot impose a revenue tax."

Under our law, a valid municipal license fee must be imposed by ordinance which meets these four indispensable requirements:

1. The business or activity licensed must be of a type which is subject to governmental regulation under the police power; and

2. The licensing ordinance must, expressly or by clear implication, regulate the licensed business or activity or the property or instrumentalities used therein; and

3. The regulation must be reasonable, and must bear a real and substantial relation to the object sought to be accomplished within the scope of the police power; and

4. The amount of the license fee may not exceed the actual or probable cost of special municipal serv-

ices needed and actually rendered to enforce the regulation imposed by the licensing ordinance, and which are not otherwise furnished or required.

Windber's amendatory ordinance complies with the first of these requirements, but not with the second, third and fourth.

1. *The licensed activity under this ordinance, the showing of X-rated movies, is the type of activity which is subject to governmental regulation under the police power.*

All business and activities are not subject to regulation, so it is essential to the validity of a regulatory ordinance and license fee that they may be applied only to a type of business or activity which is subject to police power regulation: National Biscuit Co. v. Philadelphia, supra.

When we speak of the police power, we do not mean the police force. The police power is the general power of government to regulate the activities of the citizenry, whether through the police department, fire department, health department, mayor, borough manager or secretary, committee of council, zoning commission, or other regulatory officer or agency. All such officials are exercising the police power whenever they carry out regulatory laws and ordinances. "Police power is the exercise of the sovereign right of a government to promote order, safety, health, morals, and the general welfare of society, within constitutional limits." 16 C.J.S., Constitutional Law, §174. See also Best v. Zoning Board, 393 Pa. 106; City of Wilkes-Barre v. Joseph Garabed, 11 Pa. Superior Ct. 355, and Cox v. New Sewickley Township, 4 Pa. Com. Ct. 28.

As in the case of all municipal legal power, the borough possesses only such police powers as are delegated to it by the State by law. But, unlike the

powers to tax, to assess, and to sell municipal services, which are very restricted, the borough's police power is very broad. The Borough Code contains many specific provisions for borough regulation of municipal life; in addition, boroughs are granted this general police power (53 46202(74)):

"To make and adopt all such ordinances, bylaws, rules and regulations not inconsistent with or restrained by the Constitution and laws of this Commonwealth, as may be expedient or necessary for the proper management, care and control of the borough and its finances, and the maintenance of peace, good government, safety and welfare of the borough and its trade, commerce and manufactures."

This power is to be liberally construed to accord to borough government discretion in the exercise of the police power: Adams v. New Kensington, 357 Pa. 557. There are some specific provisions in article XXIX of the code for the imposition of license fees (transient business, parking lots and order-takers), but none applies to movie theaters. Section 1202 of the code, however, gives express power to boroughs to regulate amusements, which covers motion picture exhibitions (53 PS §46202(30)):

"To regulate, license, fix the time of opening and closing, or prohibit theatrical exhibitions, amusements and dances, at which an admission or other fee is charged, and other exhibitions  .  .  ."

Even before the enactment of modern statutes, the theater business (stage or movie) had long been recognized as being subject to regulation under the police power. In Oil City v. Oil City Trust Company, 151 Pa. 454, 457 (1892), the court said:

"Certain occupations, such as tavern keeping, theatrical and kindred shows, public conveyances, barges, etc., were regulated by license in England

before the settlement of Pennsylvania, and the colonists brought with them the idea of state control of such matters. Others, such as auctioneers, hawkers and peddlers, etc., were licensed by statute so early and so continuously in the history of our legislation that their appropriateness as subjects of license became familiar as part of the common law of Pennsylvania."

The "state control" of speech, press and drama which the American colonists brought with them from England-was censorship, which was then regarded as a legitimate means of exercising the police power in the protection of public morals. The Puritans were especially fond of exercising censorship. Since then, censorship has been gradually compelled to yield to the developing first amendment freedoms of speech and of the press. The motion picture is now a constitutionally protected form of speech and, as such, has been able to throw off the yoke of censorship. A licensing ordinance, therefore, may no longer be utilized as a means of imposing a financial penalty, unrelated to cost of regulation, which is designed to discourage or terminate an unwanted performance. See Mahanoy City Borough v. Hersker, 40 Pa. Superior Ct. 50. Such a deterrent measure is akin to a fine, which is not a license fee: Mastrangelo v. Buckley, supra.

Obscenity, however, is not entitled to constitutional protection, and is prohibited by statute in Pennsylvania: Act of June 24, 1939, P. L. 874, as amended, 18 PS §§4524, 4528. Accordingly, it is still possible though difficult to prosecute criminally and punish those who exhibit obscene movies, and also to seize an obscene movie and prevent its exhibition; but censorship or seizure is not permitted without first having a full trial and adjudication on the question of

obscenity. Moreover, proof of obscenity may no longer rest on the police officer's observations and opinions of the performance; expert testimony as to obscenity is now required. See Cambist Films, Inc. v. Duggan, 420 F. 2d 687 (C.C.A. 3rd); Commonwealth v. LaLonde, 447 Pa. 364; Commonwealth v. Guild Theatre, Inc., 432 Pa. 378. Therefore, the "state control" which the colonists exercised over the theater is now considerably limited but not entirely eliminated.

There is another more restricted area within which the municipal police power may be applied in the regulation of theaters in the public interest, as illustrated in Adams v. New Kensington, supra, where the court said, pages 564 and 565:

"The record discloses, and indeed it is a matter of common knowledge, that juke boxes are placed principally in restaurants, taprooms and dance halls some of which are operated until the wee hours of the morning or even all night. It would appear to be entirely in order for a municipality to make sure, by periodic inspections, that they do not become a public nuisance by reason of their being located in a part of the establishment so near a public thoroughfare as to disturb pedestrians, or their being operated noisily or at improper hours, or because of their playing vulgar or obscene records. While it is doubtless true that the operation of these juke boxes has been heretofore generally conducted in a harmless and inoffensive manner, the municipality is nevertheless justified in protecting its citizens against any future possible lapses in that regard. Theatrical, operatic and musical performances and *motion picture shows* have always been regarded as proper subjects of police inspection and control, and, in comparison with them, the necessity for the supervision and regulation of the music and

songs furnished by juke boxes commercially operated is, at best, merely a question of degree." (Italics supplied.)

The assembly of crowds for any entertainment carries with it the potential for occasional disorderliness or creation of a public nuisance; occasional on-the-premises inspection for vulgarity or obscenity in the exhibition or performance may be warranted. Such are the justifications, if any there be, for the imposition of the smaller annual license fee in section 101A of the Windber Ordinance. It was on this basis that the court in Adams v. New Kensington, supra, sustained an annual license fee of $25 on each juke box, to cover the cost of occasional special on-the-premises police inspection and supervision in the public interest.

As to the showing of X-rated movies in particular, the activity here licensed, there is no evidence that such showing created disorderliness or danger requiring any special or additional on-the-premises inspection or supervision. If showing such movies is to be singled out for special regulation under the police power, the regulation must rest on moral grounds. No one would doubt that the people of Windber have a legitimate concern about the exposure of their children to such movies, which, according to section 101B of the ordinance are regarded by the motion picture industry as ones "to which children under the age of 18 are not to be admitted." On that basis, we think a municipality may exercise its police power to regulate and control attendance at such movies by excluding persons under 18. Courts and legal scholars are giving increasing attention to this phase of the obscenity problem. For example, this dictum appears in the opinion of Mr. Justice Brennan, of the United States

Supreme Court in Jacobellis v. Ohio, 378 U.S. 184, 84 S. Ct. 1676, 12 L. Ed. 2d, 793, 802 (1964):

"We recognize the legitimate and indeed exigent interest of States and localities throughout the Nation in preventing the dissemination of material deemed harmful to children. But that interest does not justify a total suppression of such material, the effect of which would be to 'reduce the adult population . . . to reading only what is fit for children.' Butler v. Michigan, 352 U.S. 380, 383, 1 L. Ed. 2d, 412, 414, 77 S. Ct. 524. State and local authorities might well consider whether their objectives in this area would be better served by laws aimed specifically at preventing distribution of objectionable material to children, rather than at totally prohibiting its dissemination. Since the present conviction is based upon exhibition of the film to the public at large and not upon its exhibition to children, the judgment must be . . . reversed."

In United States v. Reidel, 402 U.S. 351, and in Redrup v. New York, 386 U.S. 767, the court recognized the need for protection of children and the unwilling public from sexually oriented materials. See also Reno "Obscenity Revisited—1972," 58 A.B.A. Journal 736, July 1972, issue.

Without making any determination of obscenity, which is really not before us in this case, and on the basis solely that unfirtness of X-rated movies for exhibition to children under the age of 18 years is conceded or can be substantiated, we conclude that the showing of X-rated movies indiscriminately to adults and children affects public morals and is, therefore, a business activity which may be licensed under the police power.

*2. This licensing ordinance does not expressly or by implication place any regulation upon the licensed activity, the showing of X-rated movies, nor upon the property or instrumentalities used therein, and therefore does not meet the second requirement for a valid license fee.*

The fundamental and fatal flaw in this ordinance is that it does not exercise the police power. It regulates nothing. It is elementary that since the police power is the power to regulate, the law or ordinance which is claimed to be an exercise of that power must regulate. And it is equally plain that since a license fee is permissible only to defray the cost of that regulation, where there is no regulation, there can be no fee.

The courts have uniformly stricken down so-called license fees imposed by ordinances which contain no regulation. The restrictions imposed should be expressly and clearly stated in the ordinance, although that is not a mandatory requirement where the nature of the restrictions intended can be clearly implied. See Gettysburg Borough v. Gettysburg Transit, 36 Pa. Superior Ct. 598.

In Haller Baking Company v. Rochester Borough, 118 Pa. Superior Ct. 501, 510, the court said:

"Where legislation depends for its validity upon the exercise of police power, such legislation must be regulatory in character and the fee provided must be of such size as to indicate clearly that the act was meant to be purely a regulatory police measure and was not intended to provide revenue."

And at page 511, it was said:

"An examination of the ordinance does not indicate any provision for supervision or regulation of the licensee."

In Olan Mills v. Sharon, 371 Pa. 609, the court invalidated a license fee on transient photographers and quoted from Haller supra, also saying at page 614:

"The lack of regulatory provisions and the excessive fee clearly and unquestionably invalidate the Ordinance as an improper exercise of the police power and stamp it as a mere revenue-raising measure."

In Olan Mills v. Grove City Borough, 18 D. & C. 2d 284, the court struck down a $50 license fee on transient merchants and photographers because the ordinance did not regulate the business and, therefore, needed no enforcement service. The court said at page 289:

"A casual reading of ordinance no. 673, however, discloses that while it undertakes to require a license of transient retail businesses within the borough, it does not purport to regulate such businesses. The ordinance fails to contain a single regulation which transient businesses are required to comply with."

The court also stated at page 289:

"When any political body undertakes to regulate and license an activity it is required to specify, in the license legislation by appropriate regulations, the conduct expected of the licensee and the cost of the license must bear a reasonable relation to the cost of enforcing those regulations."

In Freeman v. Philadelphia, 178 Pa. Superior Ct. 290, the court refused to enforce collection of an annual license fee on auctioneers and said at page 296:

"No supervision or regulation is provided for, nor does the ordinance purport to be supervisory or regulatory. The payment of the tax here is necessary to avoid criminal punishment, but that is merely a matter of enforcement, not regulation."

In Kittanning v. American Natural Gas Company, supra, at page 212, the court said:

"If the municipal authorities desire such inspection, or deem it necessary as a protection to the public they must take the initiative by providing for it and fixing the amount of the annual license fee to pay for it."

In 9 McQuillen, Municipal Corporations (3rd Ed. Rev., Callaghan), §26.16, page 34, it is said:

"But an ordinance having no provisions for regulation and imposing an exaction is a tax ordinance designed to raise revenue . . ."

But this absence in the licensing ordinance of any regulation cannot be supplied by including in the ordinance a provision for regulating and controlling on the public streets and in public places the pedestrian and vehicle traffic generated by either the theater business in general or the showing of X-rated movies in particular. The reason is that the traffic regulation and general law enforcement services made necessary by the business activity do not constitute regulation of the licensed business or activity nor of any property or instrumentality used therein; that is not a regulation of any amusement nor of the theater business, nor of the showing of X-rated movies. To protect the public morals from invasion by X-rated movies, the regulation should be directed against the movies, not against the traffic out in the streets.

The primary object of a licensing ordinance is to regulate the license by "regulation of the licensee" (Haller Baking Co. v. Rochester Borough, supra, page 511), or "supervision of the license privilege" (Mastrangelo v. Buckley, supra, page 386); the ordinance must regulate "the business which it covers," "the business affected" (Flynn v. Horst, 356 Pa. 20, 28, 29). In Warner Bros, Theatres, Inc. v. Pottstown Borough, 164 Pa. Superior Ct. 91, the court held invalid a license fee on motion picture theaters, saying at pages 94 and 95:

"The primary object of a license tax is to *regulate and control the business affected* and 'if the amount of a "license fee" is grossly disproportionate to the sum required to pay the cost of the due *regulation of the business,* the "license fee" act will be struck down.' " (Italics supplied.)

Police regulation and supervision in the streets of traffic attracted to X-rated movies is an exercise of the police power over the streets and the traffic, but not over the X-rated movie which the ordinance purports to license. Regulating traffic on the street going to and from the A. & P. Store is not a regulation of the store. Regulating on-the-street traffic attracted to the drive-in bank is not a regulation of the bank. Regulating the very heavy traffic on the streets of Johnstown of workers and others brought by the steel companies, is not a regulation of the steel business. Regulating the traffic on highways in Somerset or Richland Townships attracted to the shopping centers is not an exercise of the police power over the businesses in those centers. No more is the regulation of the theater traffic on Windber streets a regulation of the theater business nor of X-rated movies. Nor are these conclusions altered by the fact that the police force also provides general law enforcement for those crowds, in addition to traffic regulation. These examples of similar common situations which prevail in our society illustrate not only the basic defect of this ordinance but also readily suggest the mischief which can be visited upon any legitimate business activity which for one reason or another is or may become officially unpopular were we to approve the principle of this ordinance.

Were we to conclude otherwise, it would be equally logical, and equally ludicrous, to contend that plaintiff must pay for the additional stop lights required, or for a needed municipal parking lot for his patrons, or for

extra street cleaning. Compare Manheim v. Workman, supra, and Erie Appeal, supra. These collateral consequences of doing business are not encompassed within the regulation of a business in the exercise of the police power and may not be included in a license fee. "It is only for supervising one's own business that one must pay in the form of a license": McQuillen, supra, §26.36, page 86.

Under the authorities, where the license fee has been sustained, the ordinance has regulated the licensed activity directly and the fee covered only the cost of supervision, inspection and regulation of the actual licensed activity, or its property and instrumentalities, not some remote and collateral consequence.

An interesting application of this principle is made in Gettysburg Borough v. Gettysburg Transit, supra, where the borough imposed a license fee upon each street car. The fee was upheld to cover the full cost of municipal inspection and supervision not only of the street cars but of all of the property and instrumentalities of the railway, including the tracks in the streets. But the court rejected evidence offered to show that because of occupation of part of the street by the tracks, the great burden of traffic is cast upon the sides of the streets not directly used by the street cars, which increases the borough's cost of street repair and maintenance; and the court held that such cost could not be included in the license fee which must be restricted in amount to the cost of inspection and supervision of the property and appliances of the licensee, that is, the tracks and only that part of the street occupied and directly used in the street car operation. The generation of increased traffic upon the sides of the streets adjacent to the street car right-of-way was a much closer and more direct consequence of the transit company's operation than is the generation of increased

traffic in the streets of the borough by this theater or any other business which operates from a fixed off-street place of business. Compare also Commonwealth ex rel. Hines v. Winfree, infra, discussed below.

Although this ordinance verbally recognizes that according to the movie industry, children under 18 should not attend such movies, the ordinance itself does not adopt that standard as a regulation. It puts no regulation or restriction whatever upon attendance at an X-rated movie.

This ordinance is, therefore, invalid because it fails to meet the second requirement for a valid license fee.

*3. Even though the ordinance had provided for additional police service on account of the theater traffic, such a regulation does not bear a real and substantial relationship to the police power objective of the ordinance.*

The police power objective of an ordinance must be limited to preservation of public order, safety, health, morals or other vital concern of public welfare; governmental regulation is impermissible unless it safeguards one of those public interests. Regulation must be reasonable; that is, it must not go further than the circumstances require: Adams v. New Kensington, supra. And regulation must be relevant; that is, it must bear a real and substantial relation to the police power goal or objective sought to be accomplished: Gambone v. Commonwealth, 375 Pa. 547.

If the objective of this ordinance is to preserve public morals from invasion from the showing of immoral movies, that objective can be reached only by regulating the movies, as, for example, excluding children from attending them. Providing extra police for street traffic is wholly irrelevant to that moral

objective. It is the morality of the movies, not of the traffic, which is and must be the target.

If the objective of this ordinance is to furnish traffic regulation and general law enforcement for the traffic, licensing the movies is wholly irrelevant to and will not accomplish that objective; indeed, the number of policemen to be hired and their duties in traffic and law enforcement are already accomplished by other ordinances and laws irrespective of this ordinance.

*4. The amount of this license fee exceeds the cost of special municipal services needed to enforce the regulation imposed by this ordinance.*

Where the power exists to enact a regulatory ordinance under the police power, there goes with it the concomitant power to impose a license fee to cover the expense of carrying out the regulation of the licensed business which the ordinance prescribes: Adams v. New Kensington, supra. But it is not sufficient merely to show that police service or additional police service was necessitated *by the conduct of the licensed business;* the additional service must be necessitated *by enforcement of the regulatory ordinance.* Every business in town generates some traffic to it and imposes some burden upon municipal government to furnish traffic control and general law enforcement, and is responsible to that degree for creating municipal expense. But that is a service which every citizen receives for his general taxes without fee. A license fee is not permitted to cover such a cost, but only "the cost to the municipality of the regulation and enforcement *of the ordinance*": Commonwealth ex rel. Hines v. Winfree, 408 Pa. 128, 134. (Italics supplied.)

The service for which a fee may be charged must be special or unusual in the sense that it is furnished

specially under the licensing ordinance and only to or for the licensee. Thus, police service to the traffic on the streets and public places, in the performance of ordinary police duty, is a general not a special service. But if a regulatory ordinance should, for example, lawfully require police service on the business premises, or in direct supervision of the property and instrumentalities with which the licensed business is conducted, in the exercise of the police power, a license fee may be imposed to cover the borough's cost of furnishing that special service. That is *American Baseball Club v. Philadelphia*, 312 Pa. 311, where the city ordinance imposed the cost for extra policemen to handle traffic at the baseball stadium *"at and on the premises"*: Pages 313, 317. (Italics supplied.) The preamble to the ordinance states that its purpose is "to regulate traffic created thereby and to guard against fire *within the premises* . . .": Page 315. (Italics supplied.) Charge was made *only* for the extra policemen used *on* the property; no charge was made for the extra policemen who were working *outside* the property in policing the crowds drawn to the stadium. The court made this clear at page 316:

"In addition, a considerable number of extra officers for the purpose of regulating traffic on streets neighboring appellees' parks, and for which no charge is made, were required."

The true rule of the case is stated in its headnote 3, as follows:

"A municipal ordinance requiring those giving athletic contests or exhibitions to which an admission is charged to pay a license fee based upon a reasonable estimate of the number of policemen or firemen which in the opinion of the director of public safety will be necessary to protect the public safety *at and on the premises* at such contests or exhibitions at a specified

rate for each policeman corresponding in fact to the amount of the policeman's wage, is within the police power of the municipality and not unreasonable." (Italics supplied.)

American Baseball is in no sense authority for the borough's proposition that a licensing ordinance may impose on the licensee the cost of general on-the-street supervision of traffic generated by the licensed business. There, the licensee was required to pay only for the police service necessitated by the ordinance on the premises for the safety of the crowd in the stadium in the exercise of the police power, and fully complied with the essentials of a valid license fee.

There is language in American Baseball which the borough might think sustains this ordinance, that "where it is necessary in the proper conduct of business that unusual demands be made on the city facilities, a reasonable charge may be made by the municipality to cover its actual expense in providing such special services": Page 314. But such reliance is misplaced; all of the cases cited for that broad proposition are conventional police power-license fee cases, and the court quotes from one of them the applicable principle as follows at page 315:

". . . 'if a corporation "so carries on its business as to justify, at the hands of any municipality, a police *supervision of the property and instrumentalities* used therein, the municipality is not bound to furnish such supervision for nothing, and may in addition to ordinary property taxation, subject the corporation to a charge for the expense of the supervision." ' " (Italics supplied.)

The stadium was a "property and instrumentality used" in the licensed business; the public streets, and the pedestrians and vehicles attracted into the public streets by the conduct of the business, are not such.

That this is the proper interpretation of American Baseball becomes clearer in Warner Bros. Theatres, Inc. v. Pottstown Borough, supra. There, the borough ordinance imposed a license fee on motion picture theaters at the rate of five percent of gross receipts. The court struck down the ordinance as a revenue rather than a regulatory measure for several reasons, including the obvious fact that there was no relationship between the amount of the fee and the cost of service; but the court also said in the course of the opinion at page 95:

"The terms of the ordinance do not provide for any special services and none are supplied; the license fee, therefore, cannot be justified on the ground that it will repay the borough for the cost of special services rendered. Cf. American Baseball Club of Phila. et al. v. Phila. et al., 312 Pa. 311, 167 A. 891. The borough on request supplies police protection to anyone carrying funds to a bank for deposit. And traffic regulation peculiar to the control of the patrons of a theater or of any other business enterprise in the borough, except under unusual circumstances, is the obligation of the municipality. The same may be said of the duty of the borough to provide fire inspection. These are general services within the purposes for which real estate taxes are levied."

The only "unusual circumstances" ever held to justify assessing the cost of traffic regulation refers to special regulatory services necessitated, not merely by the activity of the licensed business, but by the regulatory ordinance enacted under the police power as in American Baseball and Commonwealth ex rel. Hines v. Winfree, supra.

Winfree, supra, is a leading case in this field, which, although strongly relied on by the borough, illustrates the same basic principle of American Baseball, that

the fee can be imposed only for the cost of enforcing the regulatory ordinance upon the activities, property and instrumentalities of the licensed business. There, the ordinance licensed sound trucks, specifically required that the sound level must be audible at a distance of not more than 100 feet, and imposed a $25 daily license fee. The presence of police supervision at the locations of the mobile truck was necessary to enforce the volume limits on sound which the license ordinance prescribed, as well as to assist in the orderly movement of traffic into which the truck, a property and instrumentality used in carrying out the licensed activity, directly intruded. Such a roving noise box is a direct and immediate disturber and creator of traffic patterns and is substantially different from the indirect effect which a fixed place of business exerts on traffic, and the license fee was upheld. Compare Gettysburg Borough v. Gettysburg Transit, supra.

Other decisions support these basic principles. In Streyle v. Board of Property Assessment, Appeals and Review, 173 Pa. Superior Ct. 324, the issue was the taxability of mobile homes in a trailer park. The court remarked, at page 329:

"Certainly owners of house trailers in trailer parks of a community receive police and fire protection and other benefits without payment of any part of their cost. It may be conceded that they are receiving services from municipalities for which they should be taxed. The imposition of a license fee will not solve the problem, for the county, under the guise of a police regulation, cannot impose a revenue tax. Warner Bros. Theatres v. Pottstown Boro., 164 Pa. Superior Ct. 91, 63 A.2d 101. Specified classes of municipalities are vested with authority . . . to assess and collect a tax on the use or occupancy of house trailers. The legislature in its discretion well

might delegate similar authority to counties of the Second Class."

In Olan Mills v. Grove City, supra, 289, the court said:

"It was suggested at the oral argument that the amount of the license fee is used to pay for the cost of investigation, inspection and protection by the borough police department. On the contrary, the evidence discloses that the cost of these items was absorbed in the general police service which the borough furnishes generally."

In Schickshinny Borough v. Schmidt, 78 D. & C. 452, a movie theater license fee was increased from $2 to $25 monthly because the theater was on the main street and the crowds required a traffic policeman on hand when the show left out, to assist pedestrians crossing the street. The license fee was held invalid, because the service furnished was general and not special.

We have found only one case which seems to support the borough's contention. In Crawford v. Wesleyville, 68 D. & C. 215, an ordinance imposed a license fee on movable trailers. It was held invalid as to the individual owners of the trailers but valid as to the land owner operating the trailer park as a business, even in the absence of special regulation or on-the-premises supervision. The court's theory was that those who make extraordinary municipal services necessary should pay specially for them instead of thrusting the cost upon his neighbor. Apart from the fact that the decision departs from basic legal principles, it also overlooks the fact that the trailer park operator is the only one who is made to pay for general police protection which his neighbor receives without special charge. The fact that the

needs of one person or business are substantially greater than the needs of others is not and has never been held to be a sufficient basis for imposing a license fee or not. No quantitative standard for such a determination has been suggested or devised. Private businesses attracting large numbers of people and requiring greater services usually pay more general revenue taxes, resulting in substantially equitable distribution of the burden of the cost of law enforcement. The court overlooked or ignored the fact that the ordinance was not regulatory and that the additional service was not necessitated by the licensing ordinance but irrespective of it and was, therefore, not a special service for which a license fee may be charged.

In Chester City v. Western Union Telegraph Co., 154 Pa. 464, a charge of $1 per year for each utility pole in the city was upheld as a valid license fee to cover the cost of special safety inspection imposed by the ordinance in the exercise of the police power. The same has been held as to small compensatory charges for street openings and excavations: Panther Valley Watch Co. v. Blaney, 66 Pa. Superior Ct. 253. In Commonwealth v. Harrar, 12 D. & C. 2d 341, the court approved a $5 license fee on solicitors and peddlers as an aid to enforcement of the ordinance requiring registration and licensing. Transient strangers were thus identified and the authorities made aware of their presence; such a special regulation is in the public interest to prevent fraudulent sales and the commission of crime, and the fee covers the clerical cost of license issuance and an occasional investigation. In Palumbo Appeal, 166 Pa. Superior Ct. 557, an ordinance regulating sanitation at trailer camps was held to be a reasonable exercise

of the police power, and a reasonable license fee to cover the cost of specially enforcing the ordinance's regulations was approved.

This ordinance, therefore, fails to comply with the fourth requirement for a valid license fee.

## CONCLUSIONS

Since the ordinance is plainly invalid on the grounds discussed, there is no need to discuss or decide other questions raised.

Our view that a restriction upon admission of children to X-rated movies would be valid is a legal conclusion, and is neither a suggestion nor a direction to the borough authorities to adopt it, because it is for the court to determine only lawfulness, and for the borough authorities to determine the merit and wisdom of enacting or not enacting any given lawful exercise of the police power: Adams v. New Kensington, supra. Further, even though they may decide to impose such a regulation, there remains the task of devising a means of enforcement which is both lawful and workable, and it is not for the court to suggest a solution to those problems. Whether a requirement of special municipal on-the-premises supervision of patron admittance and a license fee sufficient to cover the cost thereof are valid must, so far as this opinion is concerned, remain an open question; but postulating such an arrangement serves at least as an illustration of a regulatory enactment having a real and substantial relation to the purpose of the regulation, as distinguished from the present nonregulatory ordinance. Compare Delaware and Atlantic Telegraph and Telephone Company's Petition, 224 Pa. 55, 65.

We are not unmindful of the justifiable community concern which the showing of sex oriented movies

causes. But we cannot put the stamp of judicial approval upon an enactment which violates well established law and which embodies a principle which poses a potential danger to other legitimate businesses, which attract substantial traffic to the borough. Today, it is X-rated movies. Tomorrow, it may be some other unpopular person or activity. To allow this ordinance opens the door for selective imposition of similar burdens on others.

Divining the basic purpose of this license fee is an interesting study. Its purpose is not to regulate X-rated movies, because it contains no such regulation. Its purpose is not to regulate traffic or provide general law enforcement, because it contains no such regulation and also because such police surveillance is fully provided by other laws. If its purpose is to require the theater, out of considerations of *fairness,* to pay for extra police needed because of the theater traffic, that is not a permissible goal of the police power; nor is it a valid basis for this fee for the simple reason that such an assessment is discriminatory and very *unfair* when it is imposed upon only one of many businesses or activities which attract substantial traffic to the borough, and can be made *fair* only by assessing all who are similarly situated. If its primary purpose is to raise revenue to help pay the cost of the general police force, it is a tax and cannot be imposed under the guise of a regulatory license fee. If its purpose and effect are to impose a financial burden or penalty upon the business large enough to discourage or stop the showing of X-rated movies, it is not only illegal as a fine, but also raises questions of censorship involving serious problems of constitutional law which we have felt it unnecessary to explore.

The borough is not, however, without remedy. If the movies are provably obscene, there may be criminal prosecution and seizure by the borough by following proper legal procedure. If the movies are not obscene for willing adults, but harmful for children, effective and reasonable regulation of admittance to X-rated movies may be devised by the borough. The present ordinance does little more than sell the privilege of showing an offensive or harmful movie.

### FINAL DECREE

And now, December 8, 1972: (1) The exceptions to the decree nisi are sustained; (2) the provisions of section 101B of the Windber Borough Ordinance approved March 6, 1972, are declared invalid and unenforceable, and the Borough of Windber, its officials, agents and employes are permanently enjoined and restrained from enforcing the same; and (3) each party shall pay its own costs.