# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Thomas Costa and Karen Costa,  :
and Elmtowne Gardens, LLC  :
  :
v.  :  No. 826 C.D. 2016
  :  Argued:  December 15, 2016
City of Allentown  :
  :
Appeal of: Thomas Costa, Karen  :
Costa and Elmtowne Gardens, LLC  :


BEFORE:  HONORABLE P. KEVIN BROBSON, Judge
    HONORABLE MICHAEL H. WOJCIK, Judge
    HONORABLE DAN PELLEGRINI, Senior Judge


OPINION BY JUDGE BROBSON    FILED:  January 12, 2017


Appellants Thomas Costa and Karen Costa (Costas) and Elmtowne Gardens, LLC (Elmtowne) (collectively, Appellants) appeal from an order of the Court of Common Pleas of Lehigh County (trial court), dated May 2, 2016, denying their post-trial motions following a nonjury trial.  Upon conclusion of the trial, the trial court entered an order dated, December 22, 2015, finding in favor of Appellee City of Allentown (City) and against Appellants in all respects.  For the reasons set forth below, we affirm.

In 1999, the City passed Article 1759 of the City's Property Rehabilitation and Maintenance Code entitled "Licensing Residential Rental Units" (Ordinance).  (Reproduced Record (R.R.) at 112a.)  The Ordinance's stated purpose is

> to protect and promote the public health, safety and
> welfare of its citizens, to establish rights and obligations
> of owners and occupants relating to residential rental
> units in the City and to encourage owners and occupants

to maintain and improve the quality of rental housing within the community. As a means to these ends, this [O]rdinance provides for a systematic inspection program, registration and licensing of residential rental units, and penalties.

(*Id.*) In connection with its adoption of the Ordinance, the City made certain findings:

1. There is a growing concern in the community with the general decline in the physical condition of residential rental units;

2. City records indicate there is greater incidence of problems with the maintenance and upkeep of residential properties which are not owner occupied as compared to those that are owner occupied;

3. City records indicate there are a greater number of disturbances at residential rental units than all other properties combined; and

4. City records indicate that violations of the various codes are generally less severe at owner-occupied units as compared to residential rental units.

(*Id.*) The Ordinance requires each residential rental unit located within the City to have a residential rental registration or a residential rental license before it can be lawfully rented or occupied. (*Id.* at 113a-14a.) A residential rental registration must be obtained annually until such time that the residential rental unit is inspected and a residential rental license is issued. (*Id.* at 113a, 115a-16a.) A residential rental license is issued after the residential rental unit is inspected and found to be in compliance with all City codes. (*Id.* at 113a, 116a.) The residential rental license will thereafter remain in effect until the next regularly scheduled systematic inspection occurs, which inspection will occur no more frequently than once every five years, unless there is a complaint of violation or probable cause to believe that a violation of City codes has occurred. (*Id.* at 116a.) The residential

2

rental license may be revoked if the property owner does not correct code violations discovered in connection with complaint inspections. (*Id.* at 116a-17a.) The City charges a $75 annual license fee per residential rental unit for all residential rental registrations and residential rental licenses. (*Id.* at 119a.)

The Ordinance further requires every property owner to maintain the residential rental units in compliance with all applicable codes, laws, regulations, and local ordinances, to keep the residential rental units in a good and safe condition, and to act to eliminate disruptive conduct in all residential rental units. (*Id.* at 113a.) Occupants and their guests are required to conduct themselves in a manner that does not disturb the peaceful enjoyment of the premises or nearby properties. (*Id.* at 114a.) Occupants may not cause damage to the residential rental units or engage in disruptive conduct. (*Id.* at 115a.) Police officers and other public officers are required to investigate alleged incidents of disruptive conduct and complete a report if they determine that disruptive conduct has occurred. (*Id.* at 115a.) The Ordinance sets forth the manner by which property owners and occupants may appeal the contents of a disruptive conduct report. (*Id.* at 115a, 118a-19a.) In the event that there are three disruptive conduct reports for any one residential rental unit within a twelve month period, the property owner is required to commence eviction proceedings against the occupants. (*Id.*) These provisions are commonly referred to as the City's "Rental Program."

At the time that the Ordinance was passed in 1999, there were approximately 16,000 residential rental units located in the City, and the annual license fee ranged from $11 to $21 per unit. (*Id.* at 315a, 488a.) By 2014, the number of residential rental units had increased to approximately 24,000, and the

annual license fee was $75.[1]  (*Id.* at 315a, 488a-89a.)  The residential rental units consist of garden apartments, high-end apartments, low-end apartments, conversions, single-family properties turned into multiple units, loft apartments, mixed-use properties with commercial uses on the first floor and apartments on the second floor, single-family properties, rooming units, and efficiency units. (Supplemental Reproduced Record (Supp. R.R.) at 45b.)  The quality of the residential rental units varies throughout the City.  (*Id.* at 27b-28b.)  Some residential rental units, such as older, conversion properties, are more complicated and take longer to inspect than newer, "cookie-cutter" units originally built as apartments.  (Trial Tr. Vol. I at 31-32, 59-60.)  The frequency of inspections performed on residential rental units varies depending on the location of the property, with some properties being inspected much less frequent than every five years.  (*Id.* at 209-11.)  For example, residential rental units located in the City's downtown area are subject to more complaints and, therefore, receive more frequent inspections than residential rental units located in other areas of the City. (*Id.* at 209-10.)

Appellants own and manage residential rental properties in the City. The Costas own six residential rental properties, consisting of forty-two units. Elmtowne owns one residential rental property, consisting of thirty-five units. Appellants complied with the Ordinance and paid the $75 annual license fee for each of their units since 2010.  On December 22, 2011, Appellants initiated an action against the City, alleging that the $75 annual license fee charged by the City

___

[1] The City increased the annual license fee to $75 per residential rental unit in 2010. (R.R. at 315a.)

4

since 2010 constitutes an unlawful special tax that subsidizes general functions of the City, such as police services, code enforcement, and boarding up vacant properties and that the private industry can provide the same services performed by the City under the Rental Program for a fraction of the City's cost.[2] Appellants' amended complaint, filed on February 7, 2012, sought: (1) declaratory relief in the form of a declaration that the $75 annual license fee is an unlawful special tax; (2) an injunction enjoining the City from enforcing the Ordinance and/or collecting the $75 annual license fee; and (3) a refund of the $75 annual license fee paid by Appellants for each of their residential rental units since 2010.

The trial court held a nonjury trial on July 30 and 31, and August 1, 4, and 5, 2014. At that time, Appellants presented the testimony of Robert L. Boland (Boland), a certified public accountant. Appellants' counsel provided Boland with three Pennsylvania cases, including *University Park Cinemas, Inc. v. Borough of Windber*, 59 Pa. D. & C.2d 726 (C.P. Somerset 1972), and directed Boland to rely on those cases. (Trial Tr. Vol. IV at 31-32, 76-79.) Relying on those cases, Boland testified that the only costs attributable to the Rental Program for purposes of justifying the $75 annual license fee are those direct costs related to the registration and licensure of residential rental units that would disappear if the Rental Program was terminated. (*Id.* at 31-33, 76-79.) Boland's calculation of the costs attributable to the Rental Program, therefore, included only: (1) a percentage of the wages/salaries of the employees working in

---

[2] This action was initially commenced against the City by Thomas Costa and Elmtowne. In response to preliminary objections, Appellants filed an amended complaint adding Karen Costa as a named plaintiff.

the City's rental housing division that perform Rental Program functions; (2) personnel costs related to the Rental Program as identified on the City's 2012 budget; and (3) a percentage of certain direct costs identified by David Paulus (Paulus), Director of the City's Bureau of Building Safety and Standards, such as vehicle maintenance, vehicle insurance, fuel, cell phones, and computer costs. (R.R. at 420a-31a.)

In performing his analysis, Boland did not include any costs relating to presale inspections, cleaning out and boarding up vacant properties, complaint inspections, emergency sewer responses, policing functions, and demolitions, because such costs had their own separate revenue source or were general functions that the City performed for all properties, not just rental properties. (*Id.* at 414a-16a, 433a-36a.) Boland also did not include any costs relating to non-specific, general fund expenses that support the City as a whole or a percentage of the wages/salaries of non-Rental Program personnel, such as the Mayor, information technology, council president, police officers, and zoning officers. (*Id.* at 447a-50a.) Despite his exclusion of these costs, Boland admitted that if there were disproportionate demands on the City's resources as a result of residential rental units, such costs should be included as costs of the Rental Program if they could be calculated. (*Id.* at 450a-53a.) Boland also admitted that if City employees were involved in the billing and collecting of registration and license fees, the costs associated with such activity should be included as costs of the Rental Program. (Trial Tr. Vol. IV at 96.) Boland provided inconsistent testimony as to whether all of the costs associated with the disruptive conduct reporting function were included in his calculation of the Rental Program's costs. (*Id.* at 26-27, 57, 92-94, 113, 124.)

6

Appellants also presented the testimony of Kevin Pezzano (Pezzano) and Anthony Tartaglia (Tartaglia) as experts in code enforcement and rental inspection programs. Pezzano testified that the private industry would charge between $25 and $60 per residential rental unit to perform the habitability-type inspection contemplated by the Ordinance, which equates to $205,000 to inspect and re-inspect 4,000 residential rental units. (*Id.* at 350a, 352a.) While he did not initially consider the cost associated with the disruptive conduct reporting function, Pezzano estimated that the private industry would charge an additional $10 per residential rental unit to perform that function. (Trial Tr. Vol. II at 64-65.) Tartaglia, who operates a third-party inspection company, testified that his company would charge the City between $45 and $50 per residential rental unit to inspect 4,000 residential rental units per year, or approximately $240,000 per year, with an additional $35 fee for re-inspections. (R.R. at 382a-83a, 387a.) Tartaglia estimated that his company would charge an additional $18,000 to perform the disruptive conduct reporting function, which would include sending out notice letters and meeting with property owners. (*Id.* at 383a-85a.) Tartaglia explained, however, that if a residential rental unit was non-compliant and a citation was issued, the City would be billed separately for any additional work. (*Id.* at 385a.)

In defense of Appellants' claims, the City presented the testimony of Dr. Trevor M. Knox (Knox), a certified public accountant. In calculating the costs associated with the Rental Program, Knox utilized a full cost approach that considered all costs associated with the Rental Program's activities and any involvement with residential rental units, as well as some overhead costs. (Supp. R.R. at 70b-81b.) Knox explained that he treated the Rental Program as a comprehensive program regulating all activities related to residential rental units.

7

(*Id.* at 70b.) His calculation of the Rental Program's costs included such things as: (1) those Rental Program costs identified on the City's 2012 budget, with some adjustments for personnel expenses and current litigation expenses; (2) certain non-personnel costs identified by Paulus in a 2012 expenditure detail, with some adjustments based on Knox's independent verification/calculation of such costs; (3) personnel costs for those City employees who were performing Rental Program activities, but which were not included in the City's 2012 Rental Program budget; (4) general overhead costs that could be re-allocated to the Rental Program; and (5) the costs associated with the disproportionate number of police calls to residential rental units. (*Id.* at 70b-81b.) Based on his calculation of the Rental Program's costs and the revenues generated by the $75 annual license fee per residential rental unit, Knox concluded that the costs of the Rental Program are approximately 15% below the maximum revenue generated by the license fee. (*Id.* at 82b.)

On December 22, 2015, the trial court issued an opinion and order finding in favor of the City and against Appellants. The trial court found that Appellants

> failed to meet their burden of showing [that] the City was not permitted to enact its comprehensive regulatory regime, [that] the annual $75 per [residential rental] unit fee is excessive in relation to the expenses of the regulatory program, or that the private sector can provide the same regulatory program cheaper than does the City.

(Trial Ct. Op. at 2.) In so finding, the trial court, *inter alia*, rejected Boland's testimony in favor of Knox's testimony, concluded that for all practical purposes the costs of the Rental Program equaled the revenues generated by the $75 annual license fee per residential rental unit, and found Pezzano's and Tartaglia's

8

testimony to be not credible. Appellants filed a motion for post-trial relief, which the trial court denied on May 2, 2016. This appeal followed.

On appeal,[3] Appellants argue: (1) the trial court erred in determining that the $75 annual license fee could be diverted to subsidize budgetary overhead and the costs of general, unrelated governmental services; (2) the trial court erred by not declaring the $75 annual license fee an unlawful special tax collected for general tax revenue purposes; and (3) the trial court erred by not declaring the $75 annual license fee unlawful because the private industry is able to perform the services provided by the City under the Rental Program for only 13.7% of the total annual license fees collected by the City.[4]

We first address Appellants' argument that the trial court erred when it determined that the $75 annual license fee could be diverted to subsidize budgetary overhead and the costs of general, unrelated governmental services. More specifically, Appellants argue that the amount of the City's license fee must be limited to the actual and probable costs incurred to administer the Rental Program. Appellants argue further that the trial court erred by adopting the full cost approach utilized by Knox, the City's expert, to substantiate the license fee,

---

[3] Our standard of review is limited to determining whether the trial court abused its discretion, rendered a decision with a lack of supporting evidence, or clearly erred as a matter of law. *Commonwealth v. Tobin*, 828 A.2d 415, 418 n.1 (Pa. Cmwlth.), *appeal denied*, 841 A.2d 533 (Pa. 2003).

[4] In support of their arguments, Appellants cite, *inter alia*, *Kappe v. West Chester Borough* (Pa. Cmwlth., No. 1905 C.D. 2003, filed May 11, 2004), an unreported panel decision of this Court. Because *Kappe* is an unreported decision of this Court issued prior to January 15, 2008, Appellants' citation to and reliance on *Kappe* is improper as it is prohibited by Section 414(a) of this Court's Internal Operating Procedures. Nonetheless, our decision here is not in conflict with the Court's decision in *Kappe*.

9

which approach, according to Appellants, erroneously included the following: (1) $166,556 of the City's annual general administrative overhead; (2) $482,285 of the City's annual general police services without isolating the cost of police calls related to disruptive conduct complaints; (3) $223,000 of the wages/salaries for administrative and operational personnel who perform general City services unrelated to the Rental Program; and (4) the cost of code enforcement functions that are unrelated to and predate the Rental Program, such as boarding up vacant properties, complaint inspections, responding to emergency sewer issues, and assisting in social services when living conditions of the property may be at issue. Appellants contend, to the contrary, that the actual and probable costs of the Rental Program are only those "special services" provided in connection with the Rental Program, which they limit to the direct costs associated with the registration of the residential rental unit, the initial and systematic inspection of the residential rental unit, and the disruptive conduct reporting process, because those are the only costs that were newly created by the Ordinance and would disappear if the Rental Program was discontinued. In response, the City argues that the trial court's adoption of Knox's full cost approach was "consistent with the legal standards applicable to analyzing a license fee relating to a comprehensive regulatory program[,]" and "the trial court properly determined that [Appellants] did not meet their heavy burden of proof . . . because they failed to properly account for all costs attributable to the [Rental P]rogram."[5]  (City's Br. at 24.)

---

[5] The City also argues that Appellants have attempted to reargue the facts of the case, because Appellants continue to use their version of the facts rather than those facts adopted by the trial court. The City contends that this is improper and should be disregarded, because Appellants have presented a purely legal argument to this Court for review and have not **(Footnote continued on next page…)**

The Pennsylvania Supreme Court, in *Mastrangelo v. Buckley*, 250 A.2d 447 (Pa. 1969), defined a license fee as follows:

> A license fee is a sum assessed for the granting of a privilege.  In most instances, where a license is granted the City invariably incurs expense such as the cost of registration and inspection; it is only proper that one who seeks and receives a license should bear this expense.  To defray the cost of a license a fee is charged to the licensee; however, this fee must be commensurate with the expense incurred by the City in connection with the issuance and supervision of the license or privilege.

*Mastrangelo*, 250 A.2d at 464 (footnote omitted).  "A license fee is distinguishable from a tax[,] which is a revenue producing measure characterized by the production of a high proportion of income relative to the costs of collection and supervision." *Thompson v. City of Altoona Code Appeals Bd.*, 934 A.2d 130, 133 (Pa. Cmwlth. 2007).  A municipality cannot impose a tax upon a business under the guise of exercising its police power, and, therefore, a license fee will be struck down if its amount is "grossly disproportionate to the sum required to pay the cost of the due regulation of the business." *Flynn v. Horst*, 51 A.2d 54, 60 (Pa. 1947).  "The party challenging a license fee has the burden of proving that the fee is unreasonable." *Thompson*, 934 A.2d at 133.  "All doubt must be resolved in favor of the reasonableness of the fee, since the municipality must be given reasonable latitude in anticipating the expense of enforcing the ordinance." *Id.*

---

**(continued…)**

challenged the trial court's factual findings.  While we acknowledge the City's position, we need not address this argument as it is not germane to our analysis of the issues on appeal.

We agree with the trial court that Appellants did not meet their burden of proof in this case. In order to meet their burden and establish that the City's $75 annual license fee was unreasonable, Appellants first had to present evidence regarding the costs incurred by the City in connection with the issuance of the license and the supervision of the Rental Program. In an attempt to meet their burden, Appellants presented the expert testimony of Boland, who opined that the costs attributable to the Rental Program include only those direct costs related to the registration and licensure of residential rental units that would disappear if the Rental Program was terminated—*i.e.*, the registration and licensure of the residential rental unit, the initial and systematic inspection of the residential rental units, and the disruptive conduct reporting process. Appellants' reliance on cases such as *Warner Brothers Theatres, Inc. v. Borough of Pottstown*, 63 A.2d 101 (Pa. Super. 1949), and *University Park Cinemas*, to support their narrow position that the costs attributable to the Rental Program should be limited to "special services" is misplaced. This is not a "special services" case, and a pure direct cost analysis, as adopted by Boland, is inadequate to calculate the expenses incurred by the City if there are also indirect costs related to the Rental Program. *See, e.g.*, *Thompson*, 934 A.2d at 135 ("While the [d]epartment's budget increased by only $90,000 the first year, it is clear that the [d]epartment had devoted or *redirected to the [rental inspection p]rogram* additional resources which had been included in its pre-[rental inspection p]rogram budget and which were not represented within the $90,000 increase. In justifying its license fee, the City was entitled to include *all costs attributable to the [rental inspection p]rogram*, not just those costs that resulted in an increase in the [d]epartment's budget." (emphasis added)).

While we do not necessarily agree that all of the costs presented by Knox are attributable to the Rental Program, the trial court properly rejected Appellants' limited, direct cost scheme and concluded that there were also indirect costs attributable to the Rental Program that Boland did not take into consideration in his analysis. Indirect costs that are properly attributable to a governmental program for the purposes of determining whether a license fee is grossly disproportionate are those costs related to an increased burden on existing governmental services. In other words, if the burden imposed on a budget line item increases when a new program is added, such additional burden is properly attributable to the new program regardless of whether the budget line item is increased. In essence, the governmental unit is permitted to reallocate or redirect existing costs to a newly established program if additional burdens are placed on such governmental unit's existing services. Applying these principles to the facts of the present case, the indirect costs properly attributable to the Rental Program and not considered by Boland include: (1) police services performed as part of the Rental Program's disruptive conduct reporting function; and (2) wages/salaries and other personnel expenses for existing City employees who perform general services and/or work for programs/departments other than the Rental Program, but who also perform functions for the Rental Program. On the other hand, the indirect costs that are not properly attributable to the Rental Program, but considered by Knox in his expert opinion, include: (1) general administrative overhead that supports the City as a whole and is not attributable to any one specific program, including the Rental Program; and (2) code enforcement functions unrelated to the Rental Program—*i.e.*, boarding up vacant properties, responding to emergency sewer issues, and assisting social service agencies with

13

conditions at residential rental properties. In this case, Appellants presented an "all-or-nothing" approach that only included the Rental Program's direct costs. As a result, the trial court properly concluded that Appellants failed to meet their burden of proof.

The trial court could have concluded its analysis there and did not need to make a determination regarding the Rental Program's costs or whether such costs were grossly disproportionate to the revenues generated by the $75 annual license fee. The trial court did not err, however, by accepting Knox's expert opinion. The trial court was presented with two expert opinions and rejected one expert opinion over the other. Even though Knox's expert opinion included costs that are not properly attributable to the Rental Program, we cannot find error in the trial court's decision simply because the City may have failed to present evidence sufficient to prove Appellants' case—*i.e.*, a proper calculation of the total expenses incurred by the City in connection with the Rental Program. The trial court properly concluded that Appellants failed to meet their burden of proof by not considering the Rental Program's indirect costs. The burden of proof never shifted to the City to prove those indirect costs—*i.e.*, it was Appellants' burden to calculate what portion of the general police services should be allocated to the disruptive conduct reporting function, not the City's burden. The City merely needed to show that there were at least some significant indirect costs of the Rental Program that were not quantified and considered by Boland, which it did. Once the City did so, a conclusion that Appellants failed to meet their burden of proof was proper.

We are by no means saying that the City's $75 annual license fee is reasonable. Rather, we are saying that it was Appellants' burden to establish that

14

the $75 annual license fee was grossly disproportionate, which Appellants failed to do. Appellants presented a very narrow approach that did not take into consideration any of the Rental Program's indirect costs, and once the City identified an unquantified and significant indirect cost that was properly attributable to the Rental Program and the trial court accepted such indirect cost, it was not an error for the trial court to conclude that Appellants failed to meet their burden of proof. For these reasons, we cannot conclude that the trial court committed an error of law.

Next, we address Appellants' argument that the trial court erred by not declaring the $75 annual license fee an unlawful special tax collected for general tax revenue purposes. More specifically, Appellants argue that the $75 annual license fee is an unlawful special tax because the revenues generated by it exceed the actual and probable costs of the Rental Program by 200%. In essence, Appellants argue that the total revenues generated by the $75 annual license fee are grossly disproportionate to the actual and probable expenses incurred by the City in connection with the Rental Program. In response, the City argues that the trial court properly concluded that the $75 annual license fee was not an unlawful special tax. The City argues further that the trial court properly rejected Boland's testimony because it was based on "an erroneous understanding of the legal standards governing the cost analysis applicable to license fees" and did not include any indirect costs despite his concession that such costs should be accounted for if they could be quantified. (City's Br. at 49.) As set forth more fully above, the trial court properly concluded that Appellants did not meet their initial burden of proof with respect to establishing the total costs of the Rental Program. As a result, we cannot conclude that the trial court erred by not declaring

15

the $75 annual license fee an unlawful special tax collected for general tax revenue purposes.

Finally, we address Appellants' argument that the trial court erred by not declaring the $75 annual license fee unlawful because the private industry is able to perform the services provided by the City under the Rental Program for only 13.7% of the total annual license fees collected by the City. More specifically, Appellants argue that they "presented credible, unopposed evidence from two code enforcement experts, Pezzano and Tartaglia[,] on the probable costs of the private industry to perform" the services provided by the Rental Program, including registration, inspection, and investigation of disruptive conduct complaints and that "these two, very well qualified experts testified that the private industry would perform the current Rental Program function . . . for a fraction of the [total license fees] collected" by the City. (Appellants' Br. at 57.) Appellants argue further that the trial court erred in rejecting this expert testimony on the basis that such experts did not include the costs associated with code enforcement functions, such as boarding up vacant properties, complaint inspections, responding to emergency sewer issues, and assisting in social services because such costs are not attributable to the Rental Program. In response, the City argues that Appellants' arguments must fail because "private industry charges are not a 'litmus test' for the validity of a license fee, particularly where the license fee relates to a general regulatory scheme, rather than the provision of a discrete service." (City's Br. at 53.) The City argues further that Appellants' arguments also fail because the trial court rejected Pezzano's and Tartaglia's testimony "as lacking in credibility, relevance and persuasiveness." (City's Br. at 53.)

16

In a nonjury trial, the trial court is the finder of fact and the sole judge of credibility. *In re Funds in the Possession of Conemaugh Twp. Supervisors*, 753 A.2d 788, 790 (Pa. 2000). The trial court "is free to reject even *uncontradicted* testimony it finds lacking in credibility." *D'Emilio v. Bd. of Supervisors, Twp. of Bensalem*, 628 A.2d 1230, 1233 (Pa. Cmwlth. 1993) (emphasis added). The trial court's credibility determinations will not be disturbed on appeal. *Spera v. Dep't of Transp., Bureau of Driver Licensing*, 817 A.2d 1236, 1240 (Pa. Cmwlth.), *appeal denied*, 841 A.2d 534 (Pa. 2003). Here, the trial court found that Pezzano's testimony was not credible because his expertise was with fires and fire investigations, not rental housing inspections. The trial court also found that Pezzano had no familiarity with the City and that "[h]is experiences in Plymouth and Towamencin Townships have little in common with conditions in [the City] in terms of the size of the [C]ity or its bureaucracy, demographics, housing stock, residential development[,] or the complexity and comprehensiveness of its Rental Program." (Trial Ct. Op. at 29.) Likewise, the trial court determined that Tartaglia's "experience is not comparable to [the City] or the findings which form the basis of the Ordinance." (Trial Ct. Op. at 33.) We will not disturb these credibility determinations on appeal. As a result, we cannot conclude that the trial court erred as a matter of law because Appellants failed to present any credible evidence establishing that the private sector could perform the services provided by the City under the Rental Program for a lower cost.

For all of the above stated reasons, we affirm the trial court's order.

---

P. KEVIN BROBSON, Judge

17

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Thomas Costa and Karen Costa, : 
and Elmtowne Gardens, LLC :
 :
v. : No. 826 C.D. 2016
 :
City of Allentown :
 :
Appeal of: Thomas Costa, Karen :
Costa and Elmtowne Gardens, LLC :

# **O R D E R**

AND NOW, this 12th day of January, 2017, the order of the Court of Common Pleas of Lehigh County is hereby AFFIRMED.

_____
P. KEVIN BROBSON, Judge