IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Alan Ziegler, Nicolas Bene, :
Lissette Chevalier, Jose Munoz, :
and Efrain Caban, Individually and :
on Behalf of all Similarly Situated :
Persons :
 :
v. : No. 169 C.D. 2018
 : Argued: December 13, 2018
The City of Reading, and Reading :
Area Water Authority :
 :
Appeal of: The City of Reading :


BEFORE: HONORABLE MARY HANNAH LEAVITT, President Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE MICHAEL H. WOJCIK, Judge


OPINION BY JUDGE WOJCIK FILED: August 15, 2019


This case returns to us following our remand to the Court of Common Pleas of Berks County (trial court) in *City of Reading v. Ziegler*, 142 A.3d 119 (Pa. Cmwlth. 2016). In this appeal, the City of Reading (City) challenges the order of the trial court entering declaratory judgment in favor of Appellees (Residents)[1] that the City's residential curbside recycling fee is inconsistent with the Municipal Waste Planning, Recycling, and Waste Reduction Act (Act 101).[2] The City argues that the trial court erred or abused its discretion by improperly shifting the burden to the City to defend its recycling fee; capriciously disregarding competent evidence

---

[1] The Residents are Alan Ziegler, Nicolas Bene, Lissette Chevalier, Jose Munoz, and Efrain Caban, individually and on behalf of all similarly situated persons.

[2] Act of July 28, 1988, P.L. 556, *as amended*, 53 P.S. §§4000.101-4000.1904.

that the City complied with Act 101; considering evidence of avoided costs of tipping fees; finding that any surplus of fees is inconsistent with Act 101; and allowing the Residents to alter their claim. For the reasons that follow, we vacate and remand for further calculations.

## I. Background

The City is a third class city located in Berks County with a population of over 10,000 residents, operating under a home rule charter.[3, 4] The Reading Area Water Authority (RAWA) is a municipal authority created under the Municipality Authorities Act.[5] The City delegated the responsibility for solid waste planning and plan implementation under Section 303(d) of Act 101, 53 P.S. §4000.303(d), to RAWA. The Residents either reside or maintain a place of business in the City and have paid recycling fees to the City or RAWA.

Under Act 101, cities of the third class operating under a home rule charter with populations over 10,000 are required to implement a recycling program. Section 1501(a) of Act 101, 53 P.S. §4000.1501(a). Pursuant thereto, the City enacted ordinances establishing its recycling program. In March 2014, the City revised its recycling program by enacting Ordinances 20-2014 and 21-2014, which are the subject of this appeal.

---

[3] *See* 123 The Pennsylvania Manual 6-5, 6-7, 6-46, 6-57 (2017); *Emert v. Larami Corporation*, 200 A.2d 901, 902 n.1 (Pa. 1964) ("Courts will take judicial notice of geographical facts such as the county in which a town or city is located.") (citations omitted).

[4] The City is designated as financially distressed under the Municipalities Financial Recovery Act, commonly referred to as Act 47, Act of July 10, 1987, P.L. 246, *as amended*, 53 P.S. §§11701.101-11701.712.

[5] 53 Pa. C.S. §§5601-5623.

Ordinance 20-2014 amended Chapter 496, Part 2 of the City's Code of Ordinances (Code), which pertains to the storage and collection of solid waste. Reproduced Record (R.R.) at 1031a-34a. Specifically, it eliminated a separate recycling fee and instituted a "Curbside Waste Collection Fee" (Curbside Fee) to cover the combined costs of collecting municipal waste,[6] recyclable materials,[7] and organic waste.[8]

Ordinance 21-2014 amended Chapter 212 of the City's Code governing fees by setting the Curbside Fee at $303.10 per property per year. R.R. at 1036a-37a. Imbedded in the Curbside Fee is a service fee for recyclables of $91.83 (Recycling Fee). The Recycling Fee applies to owners of residential properties with four or fewer units. Although owners are permitted to opt out of the City's curbside

---

[6] The Code defines "municipal waste" as

> Any garbage, refuse, industrial lunchroom or office waste and other material including solid, liquid, semisolid, or contained gaseous material resulting from operation of residential, municipal, commercial or institutional establishments or from community activities and which are not classified as residual waste or hazardous waste as herein defined. The term does not include source-separated recyclable materials or organic waste.

Section 496-201 of the Code.

[7] The Code defines "recyclable materials" as "[t]hose recyclable materials specified by the City for separate collection in accordance with this Part. Such materials may include, but not be limited to, aluminum cans, ferrous and bimetal cans, glass containers, plastic bottles and containers, mixed paper, white goods, major appliances, televisions, tires and large auto parts." Section 496-201 of the Code.

[8] The Code defines "organic waste" as "[l]eaves, garden residues, grass clippings, shrubbery and tree trimmings and similar materials." Section 496-201 of the Code.

3

municipal waste service by securing the services of a private hauler, they are not permitted to opt out of the City's curbside recycling service. R.R. at 1032a-33a.

In June 2014, the Residents filed a class action complaint against the City and RAWA (collectively, the City), challenging the Recycling Fee. In Count I, the Residents sought a declaratory judgment that the Recycling Fee is "in violation of the laws of the Commonwealth," namely, Act 101 and the Solid Waste Management Act (SWMA).[9] R.R. at 17a. In Count II, the Residents sought a preliminary injunction enjoining the City from billing for current or future Recycling Fees and from pursuing the collection of any Recycling Fees currently outstanding. *Id.* In Count III, the Residents sought compensatory and punitive damages as well as reasonable attorney fees. *Id.* By joint request and agreement of the parties, the trial court considered only Count I and deferred disposition of the other two counts.

On December 5, 2014, the trial court ruled that the Recycling Fee was permissible and entered an order granting judgment in favor of the City. The trial court later amended its order to facilitate interlocutory appeal to this Court.

On appeal, an *en banc* panel of this Court vacated the order and remanded the matter to the trial court for further analysis consistent with our then recent decision in *Waste Management of Pennsylvania v. Department of Environmental Protection*, 107 A.3d 273 (Pa. Cmwlth. 2015). In particular, we directed the trial court to consider whether the City's Recycling Fee will have a negative impact on the recycling program's financial self-sufficiency, as that term is used in Act 101, or a deleterious effect on the efficiencies of the City's recycling program. The remand also contemplated input on these questions from the Department of Environmental Protection (DEP).

---

[9] Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§6018.101-6018.1003.

4

On remand, the trial court interpreted this Court's opinion "to mean that if the [R]ecycling [F]ee is permitted without limits, it will relieve the City of an incentive to increase the program's efficiency and pursue other appropriate sources of funding."  Trial Court Op., 1/2/18, Finding of Fact (F.F.) No. 3.  "[W]hether recycling fees violate state law depends upon the particular implementation and amount of such fees because 'the ultimate financial self-sufficiency of the [recycling] program' and making sure the program is 'as efficient as it could be' are . . . 'obvious purposes of Act 101.'"  Trial Court Op., at 8 (quoting *Ziegler*, 142 A.3d at 130).  "If a recycling fee works against those purposes, it is inconsistent with Act 101 and thus preempted."  *Id.*  The trial court then held additional evidentiary hearings and considered briefs and arguments of the parties.

Based on the evidence and arguments presented, the trial court found that Section 496-208 of the Code, as amended by Ordinance 20-2014, provides for the Curbside Fee to be set as follows:

> The Director of Public Works shall submit an annual report by October 1 to City Council detailing projected expenses and revenues for the upcoming year and recommend a service fee *to cover all costs associated with the collection and removal of all curbside waste.*  The report shall specifically detail the amount of the curbside waste fee that is imposed to cover the costs associated with the collection of municipal waste, which shall be used to determine the amount of the fee imposed upon owners of [the properties that permissibly opt for private collection of municipal waste].

F.F. No. 8 (emphasis added).  Section 212-136 of the Code, as amended by Ordinance 21-2014, sets the specific fees each year and currently describes the fee

5

variants more clearly as "[c]ombined billing rate for municipal trash and recycling service" and "[b]illing rate for recycling service only." F.F. No. 9.[10]

The trial court found that DEP does not review municipal recycling programs to assess self-sufficiency or efficiency, and has no opinion as to the City recycling program's efficiency level. The Berks County Solid Waste Authority likewise does not play a role in reviewing or assessing the City's recycling program and has no opinion about the City program's efficiency. The City has never formally asked DEP or the Berks County Solid Waste Authority for advice or assistance in operating or assessing its recycling program. The City has not conducted its own comprehensive studies or analyses of recycling program options or efficiency. To the contrary, over the course of Court proceedings on remand, the City repeatedly discovered additional and sometimes inconsistent and unclear information about its own program costs. F.F. Nos. 10-13.

DEP's contribution to municipal efforts toward recycling program self-sufficiency consists of a single technical report, Building Financially Sustainable Recycling Programs, dated April 2005, and other technical studies such as one dated January 2015, concerning the feasibility of the City's baler for processing recycled paper. F.F. No. 14. DEP also issued the "DEP Act 175 Recycling Program Plan, July 2004 Working Draft." F.F. No. 15. This document provides commentary explaining several perspectives on the concept of program self-sufficiency:

> [A] local program can be understood as self[-]sufficient if
> its economic, social, and environmental benefits exceed its
> costs, whether or not all of these costs and benefits are

---

[10] In February 2018, the City enacted Ordinance 6-2018 amending Chapter 496, Part 2 of the Code clarifying that the Curbside Fee only covers the costs of its recycling program "that exceeds the amount available through Act 101 grants, the marketing and sale of recyclable materials, and any other Act 101-approved revenue source." *See* Appellant's Brief, Appendix F.

6

reflected in the municipality's budget. At the local level, considerable benefits are experienced, even if they are not all reflected as direct recycling benefits on the municipality's balance sheet. Finally, and more narrowly, a local program can be understood as self-sufficient if its economic benefits to the municipality's budget are equal to or exceed its costs to the municipality's budget.

F.F. No. 15. This document emphasizes assessing self-sufficiency by taking into consideration costs and benefits that may not appear on balance sheets, including "the avoided costs of disposal and tax revenue," and further notes that a program's income includes "proceeds from the sale of recyclable materials, fees and avoided disposal costs, where they can be realized." F.F. No. 16.

The City operated its recycling program "in house" from 2014 through February 2017. The City's funding for the recycling program mainly came from the Recycling Fee, periodic grants under Act 101 and the marketing and sale of recyclable materials. In 2014 and 2015, the Recycling Fee was $91.83 per property; in 2016, it was $95.04. The City recouped approximately $2.3 million of its recycling costs through the annual assessment. The marketing and sale of recyclable materials accounted for approximately $100,000 per year. Grant money varied by year and was not available every year. *See* F.F. Nos. 17, 18, 22.

According to the City's ledgers, the City's recycling program generated a surplus for the years 2014-2016:

| Year | Costs | Grants | Sales | User Fees | Surplus |
|------|-------|--------|-------|-----------|---------|
| 2016 | $2,140,859.00 | $7,815.00 | $76,997.00 | $2,529,117.00 | $473,070.00 |
| 2015 | $2,295,019.00 | $127,515.00 | $91,342.00 | $2,324,947.00 | $248,785.00 |
| 2014 | $2,323,304.00 | $98,682.00 | $110,221.00 | $2,388,891.00 | $274,490.00 |

7

*See* F.F. No. 18.  The trial court found that in each year from 2014 through 2016, the user fees collected, standing alone, without including grants or sales of recyclables, exceeded the total costs of the City's recycling program.

However, in prior years, the recycling program ran a deficit. Specifically, in 2013, the program ran a deficit of $57,854; a deficit of $958,914 in 2012; and a deficit of $468,253 in 2011.  In 2010, the program operated at a surplus of $104,127.  The trial court noted that it was not clear what efforts, if any, the City made to operate the program as efficiently as possible during the deficit years.  F.F. Nos. 20, 21.

As of March 2017, the City began outsourcing its recycling program (along with collection of waste, which was already outsourced) under a three-year fixed rate contract with BFI Waste Services of Pennsylvania (BFI).  As a result, the City no longer markets and sells the collected recyclable materials; rather, BFI is now responsible for disposing of all waste and recyclables collected and may itself sell the recyclable materials.  F.F. Nos. 19-24.

Under the contract, the City pays BFI $3,499,359.36 per year, which consists of $2,642,745.60 for curbside trash collection at an estimated 20,640 units and $856,613.76 for curbside recycling collection at an estimated 26,636 units. There is also a $41,700 education component.  When the outsourcing contract with BFI went into effect in March 2017, the City reduced its Recycling Fee to $74.04. F.F. Nos. 25-26.

The City did not factor prior surpluses into the new rate, but instead applied those surpluses against deficits in prior years.  The City anticipated a surplus in 2017, which it intended to use for some estimated transitional costs.  The City retained some responsibilities and costs of the recycling program despite the contract

8

with BFI, including purchasing and providing collection containers, administering fee collection and customer service, and conducting leaf and yard waste collection. The City anticipates an upcoming cost of $1.2 million to provide new collection bins to approximately 26,636 units (a cost of approximately $45 per bin). Tipping fees and apportioned employee salaries for the City's handling of leaf and yard waste costs the City approximately $326,000 per year. F.F. Nos. 27-30.

The trial court determined that the City did not meet its obligation to consider ways to increase the efficiency and self-sufficiency of its recycling program without reliance on a fee. The City did not conduct comprehensive studies of its recycling program options. For years, the City collected fees that were greater than the total program costs, and it did not properly account for those surpluses in setting fees for future years. The fees were sufficient to cover *all* costs of its recycling program, which is inconsistent with Act 101. The City did not timely explore outsourcing to a private contractor, which ultimately proved to be a significantly cheaper alternative to its in-house recycling program. Before entering the private contract with BFI, the recycling program was less efficient and less self-sufficient than it could have been. The trial court concluded that the fees the City imposed enabled it to operate its recycling program without properly pursuing Act 101's purposes of efficiency and self-sufficiency.

Upon concluding that the City's recycling fees were inconsistent with Act 101 as evidenced both by the amount of the fees exceeding the costs of recycling even before adding in revenue from sales of recyclables and Act 101 grants, and by the language of Ordinance 20-2014 itself permitting fees to "cover all costs associated with the collection and removal of all curbside waste," the trial court did not entertain any specific calculation of realizable avoided costs or the precise

9

appropriate fee amount generally. The trial court noted that the exact extent to which avoided costs should have lowered the fees is an issue for future proceedings on damages. The trial court also declined to consider monetary damages at this juncture because the parties agreed to have the court rule solely on Count I -- the declaratory judgment count -- before proceeding with other aspects of the case. Accordingly, the trial court entered declaratory judgment in favor of the Residents. This appeal now follows.[11]

## II. Issues

The City raises five issues for our review. First, the City contends that the trial court erred by misapplying a burden shifting analysis and placing the burden on the City to prove that its Recycling Fee as authorized by Ordinances 20-2014 and 21-2014 complied with Act 101. Prior decisional law clearly holds that the burden of proof always lies with the party challenging the reasonableness of a fee and never shifts to the municipality. Second, the City argues that the trial court disregarded credible evidence proving the City's compliance with Act 101. Third, the City claims that the trial court erred by considering evidence of avoided costs of tipping fees as a factor in determining that the City's Recycling Fee is inconsistent with Act 101. Fourth, the trial court abused its discretion and committed an error of law in finding that any surplus of fees in proportion to the costs of the recycling program is inconsistent with Act 101. Finally, the City maintains that the trial court erred by allowing the Residents to alter their claim thereby exceeding the scope of both the

---

[11] Our review in a declaratory judgment action is limited to determining whether the trial court's findings are supported by substantial evidence, whether an error of law was committed or whether the trial court abused its discretion. *Pennsylvania Independent Waste Haulers Association v. Township of Lower Merion*, 872 A.2d 224, 227 n.13 (Pa. Cmwlth. 2005).

10

declaratory judgment claim and the trial court's August 1, 2014 order limiting these proceedings to the disposition of Count I of the Complaint only.

### III. Discussion
### A. Burden of Proof

First, the City argues that the trial court improperly used a shifting burden of proof requiring the Residents to show only that the City had a surplus of fees for certain years before shifting the burden to the City to show that the City's Recycling Fee is consistent with Act 101. This is contrary to case law requiring the party challenging an ordinance to show the ordinance's invalidity. The Residents failed to prove facts supporting their claim. The Residents produced no expert testimony that the amount charged had a negative impact on the efficiencies of the recycling program. In fact, the trial court never found that the Residents met their burden of proof or that the evidence proved that the City's Recycling Fee had a negative impact on the financial self-sufficiency of the City's recycling program.

"[O]rdinances are presumed to be valid and those who challenge their validity carry a heavy burden to establish their invalidity." *Fisher v. Viola*, 789 A.2d 782, 785 (Pa. Cmwlth. 2001); *accord Chrin Brothers, Inc. v. Williams Township Zoning Hearing Board*, 815 A.2d 1179, 1184 (Pa. Cmwlth. 2003). A rebuttable presumption is not absolute or unassailable. *Commonwealth v. McNeil*, 439 A.2d 664, 667 (Pa. 1981); *Kiskadden v. Department of Environmental Protection*, 149 A.3d 380, 402 (Pa. Cmwlth. 2016), *appeal denied*, 168 A.3d 1281 (Pa. 2017). It is merely an assumption until it is disproved. *Kiskadden*, 149 A.3d at 402.

For instance, in a tax assessment appeal, the validity of the tax assessment is presumed. *Beaver Gasoline Co. v. Zoning Hearing Board of Borough of Osborne*, 285 A.2d 501, 504 (Pa. 1971). However, where the taxpayer presents

11

evidence drawing the validity of that tax assessment into question, the taxing authority may no longer rely upon the presumption, but is required to present evidence in support of the assessment to sustain its validity. *Id.* Similarly, in criminal cases, the Commonwealth is entitled to a presumption of the sanity of the criminal defendant. *Id.* But, once the defendant introduces evidence drawing his sanity into question, the Commonwealth may no longer rely upon that presumption, but is required to prove sanity, as it must every other element of the case, by affirmative evidence. *Id.* Likewise, where a zoning ordinance is challenged, a municipality is entitled to a presumption of its validity. *Id.* But, once a permit applicant presents evidence that there was a total ban on the proposed use, the municipality must present evidence to establish the validity of the total ban in terms of public interest. *Id.*

Similarly, where the reasonableness of a fee is challenged, the party challenging the fee bears the burden of proving it is unreasonable. *M & D Properties, Inc. v. Borough of Port Vue*, 893 A.2d 858, 862 (Pa. Cmwlth.), *appeal denied*, 906 A.2d 1197 (Pa. 2006). However, "[t]he burden does not shift to a municipality to prove that a challenged fee is reasonable; it always remains the burden of the challenger to show that the fees are unreasonable." *Id.*

The trial court applied the burden analysis applicable to ordinances here. The City was entitled to a presumption that its ordinances, which authorized the assessment and collection of a Recycling Fee, were valid. The trial court placed the burden on the Residents to show that the City's ordinances were inconsistent with Act 101's purposes and provisions. More particularly, pursuant to this Court's remand directive, the Residents bore the burden of proving that the City's ordinances had a negative impact on the recycling program's financial self-sufficiency, as that

12

term is used in Act 101, or a deleterious effect on the efficiencies of the City's recycling program. *Ziegler*, 142 A.3d at 139.

To that end, the Residents showed that Ordinance 20-2014 permitted a Recycling Fee that covered "*all* costs" of recycling and, *as applied*, the fee alone covered the cost of the program and generated surpluses for multiple years. In so doing, the Residents showed that the program was not as efficient as it could be thereby drawing the validity of the ordinances authorizing the fee into question. As this Court has explained, where a fee covers all costs associated with the recycling program, it does not encourage waste reduction and marketing of recyclables, nor does it use planning, grants or other incentives to attain increased efficiency contrary to Act 101's purposes. *Ziegler*, 142 A.3d at 129.

Based on the Residents' evidence, the trial court found that the fee charged and collected was high enough to cover *all* of the program costs and enabled the City to ignore the statutorily favored funding from grants and sales of recyclables in contravention of Act 101. Once the Residents presented evidence tending to show that the ordinances had a negative effect on the efficiency and self-sufficiency of the recycling program, it was up to the City to rebut this evidence. In other words, the City could no longer rely on the presumption of the ordinances' validity, and it was required to rebut the Residents' evidence in order to prevail. Upon review, the trial court correctly assigned the burden of proof.

## B. Disregard of Evidence

Next, the City contends that the trial court abused its discretion by failing to consider evidence and arguments relating to the City's Recycling Fee and program costs. The City discovered evidence that it had significant leaf and yard waste collection costs that should have been accounted for in the recycling fund, but

13

were assessed to the City's general fund. The trial court accepted the City's evidence that the leaf and yard waste collection program costs $326,000 per year, but the court did not include these costs when calculating that the City had a surplus in the recycling program. Yard waste falls within the definition of recycling. There is no explanation why the trial court ignored this evidence.

In addition, the City contends that the trial court erred by disregarding the City's argument that grants under Section 904 of Act 101, 53 P.S. §4000.904, should not be counted in the City's surplus. Section 904 grants are not limited in use to recycling programs and may be used for *any* municipal purpose. To the extent that the trial court considered Section 904 grants as a revenue source, any surplus should be reduced by the amount of Section 904 grant money received.

Further, the City asserts that the trial court failed to include in its calculations those years in which the City lost money in the recycling program. The trial court cannot consider surpluses only and must consider deficits too. The trial court also did not consider future program costs (e.g., replacement recycling bins costing $1.2 million). The City claims that when all of the revenue and costs from the six years of the recycling program that appear in the record are considered, the City actually operated its program at a net deficit.

As fact-finder, the trial court maintains exclusive province over matters involving the credibility of witnesses and the weight afforded to the evidence. *In re Penn-Delco School District*, 903 A.2d 600, 608 (Pa. Cmwlth. 2006), *appeal denied*, 921 A.2d 499 (Pa. 2007). The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *Boro Construction, Inc. v. Ridley School District*, 992 A.2d 208, 218 n.16 (Pa. Cmwlth. 2010). As a result, this Court is prohibited

from making contrary credibility determinations or reweighing the evidence in order to reach an opposite result. *Penn-Delco*, 903 A.2d at 608.

In fact, we are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard of competent and credible evidence. *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 812 A.2d 478, 487 (Pa. 2002). "Review for capricious disregard of material, competent evidence is an appropriate component of appellate consideration in every case in which such question is properly brought before the court." *Id.* Capricious disregard occurs only when the fact-finder deliberately ignores relevant, competent evidence. *Id.*

### 1. Leaf and Yard Waste

After the August 2017 hearing, the City discovered it had significant leaf and yard waste collection costs that should have been accounted for in the recycling fund, but were assessed to the City's general fund. The Residents filed a motion *in limine* to preclude this evidence. The trial court did not rule on the motion, but did consider the City's evidence regarding yard waste and leaf collection.

In fact, the trial court found that this service costs the City approximately $326,000 per year. Despite this finding, the trial court did not factor this evidence into its surplus analysis. The trial court found that the City accounted for this expense in the City's general fund, not in the City's recycling program fund. By including this expense in the general fund, it was paid for by property taxes, not by user fees, Act 101 grants or the sale of recyclable materials. R.R. at 1575a.

However, "leaf waste" clearly falls within the definition of recycling. Section 103 of Act 101, 53 P.S. §4000.103. Costs related to leaf waste are

15

attributable to the recycling program, notwithstanding that the City accounted for this expense in its general fund. By excluding evidence directly related to the actual costs of the recycling program, the trial court did not present a complete or accurate picture of what it actually costs the City to operate its recycling program. Thus, we conclude that the trial court erred by excluding these expenses in its calculations and efficiency analysis.

## 2. Section 904 Performance Grants

As for the Section 904 performance grants, the trial court found that from years 2014 through 2016, the user fees collected – standing alone, without the inclusion of grants or sales of recyclables – exceeded the total costs of the recycling program. The trial court reached this determination regarding the fees irrespective of the performance grants.

Notwithstanding, as the City points out, Section 904 grants, unlike those under Section 902 of Act 101,[12] are not limited in use to recycling programs

---

[12] Conversely, Section 902 grants are limited for the development and implementation of municipal recycling programs. Specifically, Section 902 authorizes DEP to:

> [A]ward grants for development and implementation of municipal recycling programs, upon application from any municipality which meets the requirements of this section. The grant provided by this section may be used to identify markets, develop a public education campaign, purchase collection and storage equipment and do other things necessary to establish a municipal recycling program. The grant may be used to purchase collection equipment, only to the extent needed for collection of recyclable materials, and mechanical processing equipment, only to the extent that such equipment is not available to the program in the private sector. The application shall be made on a form prepared and furnished by [DEP]. The application shall explain the structure and operation of the program and shall contain such other information as [DEP] deems necessary

16

and may be used for *any* municipal purpose.  53 P.S. §4000.904(d)(6) ("the grant funds awarded under this section may be expended by the municipality on *any expense as determined in the discretion of the municipality*") (emphasis added). There is no requirement for the City to apply Section 904 grants to its recycling program.  Because the City chose to apply its Section 904 grants to its recycling program, the trial court properly factored this money into its analysis.[13]  Thus, we discern no error in this regard.  We note that the City's use of this unrestricted grant money towards its recycling program is evidence that the City is using any means available to attain "financial self-sufficiency, as that term is used in Act 101." *Ziegler*, 142 A.3d at 139.

### 3. Past Deficits

As for the deficit years, the trial court found that the program ran a deficit in the years 2011-2013.  The trial court found that it was "not clear what

---

to carry out the provisions and purposes of this act.  The grant under this section to a municipality required by section 15011 to implement a recycling program shall be 90% of the approved cost of establishing a municipal recycling program.  The grant under this section to a municipality not required by section 1501 to implement a recycling program shall be 90% of the approved cost of establishing a municipal recycling program.  In addition to the grant under this section, a financially distressed municipality, as defined in section 203(f) of the act of July 10, 1987[, P.L. 246, *as amended*, 53 P.S. §11701.203(f)], known as the Financially Distressed Municipalities Act, that is required by section 1501 to implement a recycling program shall be eligible for an additional grant equal to 10% of the approved cost of establishing a municipal recycling program.

Section 902(a) of Act 101, 43 P.S. §4000.902(a).

[13] Where a municipality chooses to use such funds for non-recycling purposes, Section 904 grants should not be factored into the analysis as a revenue source.

efforts, if any, the City made to operate the program as efficiently as possible during the deficit years." Trial Court Op. at 6. The trial court did not apply deficits in its calculations. Again, the purpose of the remand order was to determine the efficiency of the recycling program. The uncontroverted evidence demonstrates that the City ran a deficit in some years. Those deficits had to be recouped in future years. We conclude that the trial court erred by not considering deficits in its calculations.

### 4. Anticipated Costs

The City also presented evidence that the current fee contemplates anticipated costs. Specifically, the City presented testimony that it expects to incur a $1.2 million expense in replacing recycling bins for all 26,636 customer households. If the City were to apply all $1.2 million to any single year, it would require the City to add approximately $46 to each customer's recycling bill. R.R. at 1277a. The City's managing director testified that the City is considering amortizing that cost over a three-or five-year period. R.R. at 1274a. Despite finding that the City anticipates an upcoming cost of $1.2 million to provide new collection bins, F.F. No. 29, the trial court did not consider this sum in its analysis or offer any explanation as to why anticipated costs could not be used to offset the amount of revenue generated. In this regard, the trial court erred.

The purpose of the *Ziegler* test is to determine the efficiency of the recycling program. The trial court found that the user fees covered all costs of recycling and generated surpluses and, thus, were contrary to Act 101. However, the trial court's calculations disregarded key data regarding actual costs of the program. By not considering the City's leaf and yard waste collection costs, prior years' deficits or anticipated program costs, the trial court did not capture an accurate

18

and complete picture of the program's efficiency. Consequently, we are unable to determine whether the Recycling Fee is consistent with or contrary to Act 101. Thus, it is necessary to vacate and remand for proper consideration of this evidence and further calculations that include the disregarded data.

## C. Avoided Costs of Tipping Fees

Next, the City contends that the trial court erroneously considered tipping fees[14] that the City avoids paying when determining whether the City's Recycling Fees were consistent with Act 101. The City maintains that the Recycling Fees would have increased had the City not avoided the tipping fees. Moreover, the City argues that consideration of avoided costs of tipping fees has no place in the discussion of whether the City's assessment and collection of its Recycling Fee had a negative impact on its recycling program.

Section 1712(a) of Act 101, 53 P.S. §4000.1712(a), provides "[p]rogram costs are excessive when reasonable and necessary costs of operating the program exceed income from the sale or use of collected material, grant money received from the department pursuant to section 902 and avoided costs of municipal waste processing or disposal." Section 1712(a) merely serves as an affirmative defense to certain types of enforcement actions brought by DEP. 53 P.S. §4000.1712(a). However, there is scant reference to avoided costs elsewhere in Act 101.

---

[14] A tipping fee is the charge levied upon a given quantity of waste received at a waste processing facility. "The 'tipping fee' includes state-mandated fees set forth in Act 101 and other solid waste laws. The 'tipping fee' may vary depending on the hauler, the time of year, market conditions, the volume of waste a particular hauler regularly delivers to the facility, the payment history of the hauler and whether or not the hauler pre-pays the 'tipping fee.'" *Pennsylvania Waste Industries Association v. Monroe County Municipal Waste Management Authority*, 80 A.3d 546, 549 (Pa. Cmwlth. 2013).

Notwithstanding, this section appears to reflect the General Assembly's intention that avoided costs are a factor in determining the efficiency and self-sufficiency of a recycling program. According to DEP, "a program can be understood as self[-]sufficient if its economic, social, and environmental benefits exceed its costs, whether or not all of these costs and benefits are reflected in the municipality's budget." F.F. No. 15. Recycling and diverting waste from overburdened landfills certainly serves an economic, social and environmental benefit. *See* Section 102 of Act 101, 53 P.S. §4000.102. However, avoided tipping costs are *not* a revenue source or a cost. Rather, they are merely costs that the City did not incur. In other words, they are not realized. As such, avoided costs would have no effect on whether the City's assessment and collection of its Recycling Fee had a negative impact on its recycling program.

Upon review, the trial court "did *not* entertain any specific calculation of realizable avoided costs or the precise appropriate fee amount generally." Trial Court Op. at 12 (emphasis added). Thus, we discern no error in this regard.[15]

### D. Surplus of Fees

Next, the City argues that a surplus that is reasonably commensurate with the costs of the recycling program is consistent with Act 101. The law states that any fee is valid if the revenue generated by the fees is reasonably commensurate with the costs incurred. The trial court summarily concluded that any surplus is

---

[15] Insofar as the trial court indicated that "[t]he exact extent to which real avoided costs should have lowered the fees is an issue for proceedings on damages," for purposes of judicial economy, we note that avoided costs would not result in lower fees. Trial Court Op. at 12. However, because the trial court did not reach the damages stage of the proceedings or determine what extent, if any, avoided costs would have on the Recycling Fee, we find no error in this regard.

inconsistent with Act 101, without regard to whether the fees were disproportionate to the costs.

> Recently, this Court held:
>
>> A municipality cannot impose a tax upon a business under the guise of exercising its police power, and, therefore, a license fee will be struck down if its amount is "grossly disproportionate to the sum required to pay the cost of the due regulation of the business." *Flynn v. Horst*, 51 A.2d 54, 60 (Pa. 1947). "The party challenging a license fee has the burden of proving that the fee is unreasonable." *Thompson v. City of Altoona Code Appeals Bd.*, 934 A.2d 130, 133 (Pa. Cmwlth. 2007). "All doubt must be resolved in favor of the reasonableness of the fee, since the municipality must be given reasonable latitude in anticipating the expense of enforcing the ordinance." *Id.*

*Costa v. Allentown*, 153 A.3d 1159, 1165 (Pa. Cmwlth. 2017). A demonstration of surpluses alone would not defeat the reasonableness of the fee. *See id.* This Court has held that "fees charged by a municipality for services rendered are proper if they are reasonably proportional to the costs of the regulation or the services performed." *M & D Properties*, 893 A.2d at 862 (emphasis added).

Although these cases are certainly instructive, they do not involve application of Act 101. Act 101, as interpreted by this Court, requires the courts to examine the efficiency of the recycling program and *whether attendant user fees impact the efficiency and self-sufficiency of the recycling program.* *Ziegler*, 142 A.3d at 130; *Waste Management*, 107 A.3d at 287.

Here, the trial court found that the Residents demonstrated that the ordinances permitted a Recycling Fee that covers all costs of the recycling program and, as applied, the Recycling Fee covered all costs of recycling and generated surpluses that were not considered by the City in setting the fee.

21

As discussed above, the trial court erred in its calculation of a surplus. Until a new calculation is made, it is unclear whether the fee generated a surplus over multiple years. Moreover, while a surplus may be indicative of inefficiency under Act 101, such may be offset by other factors, including evidence regarding amortization of anticipated costs.

### E. Alteration of the Residents' Claims

Finally, the City argues that the trial court erred by allowing the Residents to argue that the fee was excessive, a claim not raised in their complaint. In Count I of the complaint, the Residents merely claimed that the City's fee was inconsistent with Act 101, not excessive. The trial court should have precluded the Residents from proceeding on its new excessive fee argument without amending its complaint to include this new claim. By allowing this new claim to move forward, the trial court deprived the City the opportunity to present preliminary objections or conduct full discovery.

On remand, this Court directed the trial court to consider whether the curbside recycling fee will have a negative impact on the recycling program's financial self-sufficiency, as that term is used in Act 101, or a deleterious effect on the efficiencies of the City's recycling program. *Ziegler*, 142 A.3d at 139. As the trial court found, "[c]onsideration of the amount of the fee and related financial details was thus necessary to comply with the remand and give a final answer to the question of whether the City's fee is permissible." Trial Court Op. at 2. Consideration of whether the fee was inconsistent with Act 101 requires an examination of whether the fee was excessive or unreasonable in relation to actual costs of the program. We note that a fee is unreasonable if it is used by a

22

municipality purely to generate revenue with little regard to the recycling program's efficiency or the goals of Act 101.

## IV. Conclusion

For these reasons, we vacate and remand insofar as the trial court's calculations did not include leaf and yard waste collection costs, prior year's deficits or anticipated program costs, and we affirm in all other respects.[16]

_____

MICHAEL H. WOJCIK, Judge

---

[16] We also note that funding recycling programs has become a difficult matter. Pursuant to *Ziegler*, the goal of Act 101 is to have recycling programs that maximize funding available from Act 101 grants, sales from recyclables and alternative resources to attain increased efficiency. *Ziegler*, 142 A.3d at 129. Act 101 has a laudable but unrealistic goal of self-funding. *Id.* at 137. As this Court recognized in *Ziegler*, self-sufficiency may be beyond the capabilities of municipalities and recognized that user fees, which are not prohibited by Act 101, are used to fund recycling programs. *Id.* Since its enactment, the recycling market has essentially collapsed. The ability to sell recyclable material has decreased dramatically. *See* R.R. at 1676a. As a result, recycling has become much more costly to local governments. Nevertheless, it is the function of the General Assembly, and not this Court, to reexamine Act 101 and the hardship that it is placing on municipalities and to develop new ways to encourage and incentivize waste reduction. *See, e.g.*, Pa. Const. art. II, §1 ("The legislative power of this Commonwealth shall be vested in a General Assembly[.]"); *Tosto v. Pennsylvania Nursing Home Loan Agency*, 331 A.2d 198, 202 (Pa. 1975) ("It is the province of the legislature, not the judiciary, . . . to determine the means necessary to combat public problems, for with means as with ends, the legislature, which is more responsive to the people and has more adequate facilities for gathering and assembling the requisite data, is in a better position to evaluate and determine alternative approaches.") (citation and internal quotations omitted).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Alan Ziegler, Nicolas Bene, | : | |
| Lissette Chevalier, Jose Munoz, | : | |
| and Efrain Caban, Individually and | : | |
| on Behalf of all Similarly Situated | : | |
| Persons | : | |
| | : | |
| v. | : No. 169 C.D. 2018 | |
| | : | |
| The City of Reading, and Reading | : | |
| Area Water Authority | : | |
| | : | |
| Appeal of: The City of Reading | : | |

# **O R D E R**

AND NOW, this 15th day of August, 2019, we VACATE the order of the Court of Common Pleas of Berks County, dated January 2, 2018, and REMAND this case for additional calculations in accordance with the foregoing opinion, and AFFIRM in all other respects.

Jurisdiction relinquished.

_____
MICHAEL H. WOJCIK, Judge